IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| James Jeffers, | ) | Civil Action No.  2:06-3084-CWH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Lafarge North America, Inc., | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

The plaintiff, James Jeffers ("plaintiff" or "Jeffers"), filed this action against his former

employer, Lafarge North America, Inc. ("defendant" or "Lafarge"), alleging age discrimination

under the Age Discrimination in Employment Act of 1967, as amended (the "ADEA"), 29

U.S.C. §§ 621-634.  This matter is before the Court on Lafarge's motion for summary judgment.


**Plaintiff's Allegations**

Jeffers was born in 1944, and in 1975, he began a thirty-year career at the Harleyville

cement plant (the "Harleyville Plant"), which was owned by Gifford Hills Cement.[1]  (Pl. Dep.

12; 17; Pl. Aff. ¶ 2).  Jeffers first was hired into the position of Utility Worker in the

Maintenance Department.  (Pl. Dep. 18; Pl. Aff. ¶ 3).  Jeffers was promoted to Stores Clerk

around 1976.  (Pl. Dep. 22; Pl. Aff. ¶ 3).  As Stores Clerk, Jeffers provided the Maintenance

---

[1]    The plaintiff's deposition is attached as Ex. 1 to the plaintiff's memorandum in
opposition ("Pl. Mem. Opp'n") to the defendant's memorandum in support of
summary judgment ("Def. Mem. Summ. J.").  The plaintiff's affidavit is attached
as Ex. 2 to Pl. Mem. Opp'n.  The defendant filed a reply to the plaintiff's
memorandum in opposition, which will be referred to herein as "Def. Reply".

Department with supplies and equipment parts. (Pl. Dep. 23-24). In 1977, Jeffers was promoted to Shift Supervisor, which was on the manufacturing side of the plant's operations. (Pl. Dep. 23-25). As a Shift Supervisor, Jeffers did his own maintenance and worked on the plant's dust collection equipment,[2] although there was "very little" preventive maintenance done at that time. (Pl. Dep. 25-26).

In 1977, Jeffers was promoted to Plant Relief Foreman and filled in for employees, including Shift Supervisors, when they were out on leave or on vacation; he performed shift work, and also worked in the Quarry, Stores, Shipping and Manufacturing Departments. (Pl. Dep. 27; 29; Pl. Aff. ¶ 3). As Plant Relief Foreman, Jeffers also gained experience as a supervisor in many of the plant's departments. (Pl. Dep. 27; Pl. Aff. ¶ 3). Although Jeffers worked as a Shift Supervisor, his title was always Plant Relief Foreman. (Pl. Dep. 29-30). As Plant Relief Foreman, Jeffers became very familiar with the entire Harleyville Plant because he had to perform many different jobs there (Pl. Dep. 27; Pl. Aff. ¶ 3), but he performed very little work on the dust collection equipment because two other Utility Department employees (part of the Maintenance Department) worked on the dust collection equipment. (Pl. Dep. 28).

Around 1988, the Harleyville Plant was purchased by Beazer, Incorporated. (Pl. Dep. 22). In 1990, Jeffers, who was still in the position of Plant Relief Foreman, suffered a heart

---

[2]    According to Lafarge, at any location in the Harleyville Plant where dust is created in the manufacturing process, ducts are placed and connected to large enclosed passages which are used to drawn in air and push the air through filters called bags. This process removes dust from the air. In essence, the Harleyville dust collection devices work on the same principal as a household vacuum cleaner, except on a much larger scale. In the Harleyville Plant, there are numerous dust collection devices and they vary in size from 30 bags (filters) to 4,000 bags. *See* Def. Mem. Summ. J. 3, n.2.

attack, and his doctor advised him to discontinue working shift work at night.  (Pl. Dep. 29-30).

Around this time, Blue Circle Cement acquired ownership of the Harleyville Plant, and when

Jeffers returned to work following his heart attack, the position of Special Projects Supervisor

was created for him so he could work day shifts.  (Pl. Dep. 30-32; Pl. Aff. ¶ 4).  As Special

Projects Supervisor, Jeffers reported directly to the Plant Manager.  (Pl. Dep. 32).  Jeffers' duties

included procuring and installing new equipment and working with engineers on design-build.

(Pl. Dep. 32; Pl. Aff. ¶ 4).  Jeffers did not have a full-time crew working for him, but supervised

those employees assigned to him on an as-needed basis.  (Pl. Dep. 32-33; Pl. Aff. ¶ 4).  As

Special Projects Supervisor, Jeffers performed some design work, testing, and installation of new

dust collection equipment.  (Pl. Dep. 33-34).

Jeffers testified that around 1995 or 1996, a new plant manager came in and eliminated

Jeffers' Special Project Supervisor position.  (Pl. Dep. 35-36).  Jeffers became a Maintenance

Supervisor.  (Pl. Dep. 36).  In his deposition, Jeffers testified that his position was Maintenance

Supervisor (Pl. Dep. 36), and Lafarge's counsel likewise referred to the position held by Jeffers

as such.  (*See, e.g.*, Pl. Dep. 37, 38, 39, 40, 41, 43 44, 45, 55, 62, 63).  However, Lafarge's

documents consistently show that Lafarge referred to Jeffers' position as Maintenance

Coordinator.  (*See* documents listed at Pl. Mem. Opp'n 3, n. 20).  Jeffers executed an Affidavit

approximately six months after his deposition in which he referred to his position as

Maintenance Coordinator.  (Pl. Aff. ¶¶ 5, 6, 9, 10, 11, 13, 15).  Jeffers contends that the titles

Maintenance Coordinator and Maintenance Supervisor were interchangeable and referred to the

same position during his employment at the plant.  (Pl. Mem. Opp'n 3-4; Pl. Aff. ¶ 5).  Jeffers

testified that he did not know the specific differences between the jobs of Maintenance

Supervisor and Maintenance Coordinator.  (Pl. Dep. 63-64).

The Maintenance Department consisted of maintenance employees, two Maintenance Supervisors, a Maintenance Planner, a Maintenance Manager, a Plant Engineer, and the Plant Manager.  (Pl. Dep. 36-37).  Jeffers testified that he was one of two Maintenance Supervisors in the Maintenance Department and could not recall that this position had any other title.  (Pl. Dep. 37).  After Jeffers worked in the Maintenance Department for a while, he supervised two employees, and that number later grew to four employees.  (Pl. Dep. 38).  Jeffers does not remember the name of the other Maintenance Supervisor or recall the number of employees who reported to the other Maintenance Supervisor.  (Pl. Dep. 37-38).  The two Maintenance Supervisors would assist each other in performing their work.  (Pl. Dep. 42-43).

When Jeffers first started as a Maintenance Supervisor in 1995-96, he was assigned all of the dust collection maintenance work in comparison to the other Maintenance Supervisor.  (Pl. Dep. 41, 43).  The dust collection equipment included over thirty-eight dust collectors, or baghouses, at the Harleyville Plant.  (Pl. Dep. 39-40; 48).  He performed 90% of the dust collection maintenance work, compared to the other Maintenance Supervisor.  (Pl. Dep. 43). Jeffers testified that work on the dust collection equipment took up most of his time when he first began as Maintenance Supervisor, but he performed less work on the dust collection equipment and more general maintenance work over a period of three or four years.  (Pl. Dep. 41-46). Jeffers was aware that at some point in time his position was referred to as "Dust Collection Maintenance Supervisor," but he did not use that term.  (Pl. Dep. 46).  Jeffers testified that the dust collection work decreased after he worked on that equipment because the equipment performed better and required less maintenance; as a result, he was assigned other maintenance

work.  (Pl. Dep. 47-48).  Before Lafarge upgraded the largest baghouse, the Kiln Baghouse, Jeffers estimated he spent about 10% of his time addressing problems specifically related to that baghouse.[3]  (Pl. Dep. 48, 52-53).  After the Baghouse was upgraded, the amount of work he performed on that dust collection equipment was reduced by about 10% or less.  (Pl. Dep. 53).

When Jeffers first started as Maintenance Supervisor, in addition to his maintenance work on the dust collection equipment, Jeffers performed maintenance on other equipment at the Harleyville Plant.  (Pl. Dep. 40).  As Maintenance Supervisor, he worked in the Bagging Department, where the plant produced mortar mix and bag cement, and in the Shipping Department.  (Pl. Dep. 53-55).  Jeffers also did forestry-related work; as of 2005, Jeffers spent less than 2% of his time doing forestry related activities.  (Pl. Dep. 55-57).  During 2004-2005, the last year Jeffers worked at the Harleyville Plant, he was responsible for maintenance on the recycling facility equipment.  (Pl. Dep. 54-55, 57).  Jeffers' regular duties also included coordinating the purchase of materials for stocking and future use.  (Pl. Aff. ¶ 6).  He coordinated his daily schedule with the Maintenance Planner and created and maintained a yearly budget.  (Pl. Aff. ¶ 6).  Jeffers also was responsible for working in all areas of the Harleyville Plant after regular hours of work on both a scheduled and unscheduled call-out basis.  (Pl. Aff. ¶ 6).  Jeffers contends that his combined experience provided him with an extensive knowledge of the equipment and machinery at the Harleyville Plant, and he could handle most of the maintenance there.  (Pl. Aff. ¶ 7).

_____

[3]      The Kiln Baghouse is the largest dust collection device at the Harleyville Plant and has approximately 4,000 bags (filters).  (Def. Mem. Summ. J. 5, n.3).  The Kiln is a rotary furnace that is used to convert raw material into an intermediate material called clinker by using extreme heat.  (Def. Mem. Summ. J. 8, n.4).

## Blue Circle Cement hires additional employees

In August 2000, David Stinson ("Stinson") was hired by Blue Circle Cement as a Maintenance Planner at the Harleyville Plant; he held that job for three years before becoming a Project Engineer for the next two and one-half years.  (Stinson Aff. ¶¶ 2-3, attached as Ex. 9 to Def. Mem. Summ. J.)  In 2001, Bart Quattlebaum ("Quattlebaum") was hired by Blue Circle Cement as a Maintenance Planner at the Harleyville Plant.  (Pl. Ex. 4).  Quattlebaum's employment application indicated that he had graduated from college in 2001 with a B.A. in industrial management, and had no prior work experience before being hired at the Harleyville Plant.  (Pl. Ex. 5).  According to Jeffers, Quattlebaum, as Maintenance Planner, was responsible for scheduling the Maintenance Department's work.  (Pl. Aff. ¶ 12; *see also* Pl. Ex. 6).[4]

## Lafarge purchases the Harleyville Plant

Also in 2001, Lafarge purchased the Harleyville Plant from Blue Circle Cement.  (Pl. Dep. 89).  During 2001 and into 2002, Lafarge made no changes in the management or overall operations at the Harleyville Plant, and it continued to be managed by the former Blue Circle management team.  (Pl. Dep. 89).  According to Gail Hoffman ("Hoffman"), Lafarge's Director of Human Resources for Southeastern Cement Operations at that time, the Harleyville Plant failed to meet Lafarge's economic expectations during 2002 and 2003 because it consistently produced less product and incurred higher costs of operation than expected.  (Hoffman Aff. ¶ 4, attached as Ex. 4 to Def. Mem. Summ. J.).  One of the first things Lafarge tried to do to improve

---

[4]     By Brief, however, Jeffers also states that when Quattlebaum was promoted from the position of Maintenance Planner, Jeffers was told that Quattlebaum was a Maintenance Coordinator, which was the same position held by Jeffers.  (Pl. Mem. Opp'n 19, *citing* Pl. Aff. ¶¶ 10, 12-13).

the overall performance of the Harleyville Plant involved making capital upgrades.  (Hoffman Aff. ¶ 5).

### The Kiln Baghouse is upgraded

To improve the financial picture at the Harleyville Plant, Lafarge embarked upon certain capital upgrades, one of which involved the upgrade of the Kiln Baghouse.  (Hoffman Aff. ¶¶ 4-5).  Jeffers was consulted regarding this project.  (Pl. Dep. 49).  Jeffers testified that the upgrade was 15 years' overdue and that the outdated Kiln Baghouse caused the following problems:  (1) corrosion of its steel structure; (2) a negative impact on production; (3) the production of excess dust and atomospheric pollutants, which caused environmental problems; and (4) the need for overtime work and the use of numerous contractors for repairs.  (Pl. Dep. 51-52).  According to Stinson, a Maintenance Planner, the age and deterioration of the Kiln Baghouse caused Lafarge to spend a great deal of money on maintenance costs and repairs.  (Stinson Aff. ¶ 8).

In 2002, Lafarge started the process of upgrading the Kiln Baghouse.  (Stinson Aff. ¶ 9).  Stinson testified that although the estimated cost for the upgrade was approximately $5 million, Lafarge justified this expense on the grounds that the upgrade could save over $500,000.00 per year in maintenance costs.  (Stinson Aff. ¶ 9).  Specifically, the upgrade to the Kiln Baghouse was expected to save over $400,000.00 per year in maintenance bin costs and over $140,000.00 per year in maintenance staff costs through the elimination of two individuals who were working for Jeffers on his dust collector maintenance crew.  (Stinson Aff. ¶ 10; Hoffman Aff. ¶ 5).  The elimination of two maintenance positions on the dust collector maintenance crew was an economic justification specifically listed in the initial project report on the Kiln Baghouse Upgrade submitted to Lafarge in 2002.  (Hoffman Aff. ¶ 5; Stinson Aff. ¶ 11; Ex. 1 attached to

Stinson Aff. at 11) ("In addition this installation will allow the plant to reduce its overall headcount by two individuals in the dedicated dust collector maintenance crew for a savings of $141k/yr.").

Starting in October 2003, Stinson took over the Kiln Baghouse project full time. (Stinson Aff. ¶ 9). The costs of maintaining and repairing the Kiln Baghouse before the upgrade are as follows:

| Year | Number of Labor Hours Attributed to Maintenance and Repairs of the Kiln Baghouse |
|------|----------------------------------------------------------------------------------|
| 2000 | 1,958 |
| 2001 | 1,254 |
| 2002 | 1,682 |
| 2003 | 2,184 |

(Stinson Aff. ¶ 11). The upgrade to the Kiln Baghouse was completed in 2004. (Hoffman Aff. ¶ 6; Stinson Aff. ¶ 11). After the Kiln Baghouse upgrade occurred in March and April 2004, there was a significant reduction in the amount of dust collection repair work needed for the Kiln Baghouse. (Porter Aff. ¶ 8, attached as Ex. 8 to Def. Mem. Summ. J.). The Harleyville Plant was able to reduce the number of maintenance labor hours spent on the Kiln Baghouse by well over 60%. (Hoffman Aff. ¶ 6). During the remainder of 2004, Lafarge incurred approximately 420 maintenance labor hours on the Kiln Baghouse. (Stinson Aff. ¶ 12). Consequently, Lafarge was able to reduce the dust collector maintenance crew managed by Jeffers by two individuals in 2004, leaving Jeffers with a full-time crew of only two maintenance technicians. (Stinson Aff. ¶ 13). From January 2005 through October 2005, Lafarge incurred approximately 206 maintenance labor hours on the Kiln Baghouse. This was a significant cost savings for Lafarge. (Stinson Aff. ¶ 12).

Page 8 of  39

As Maintenance Coordinator, Jeffers was supervised by Maintenance Manager Don Hay ("Hay"). (Pl. Dep. 64). Jeffers testified that in the years leading up to his termination, Hay evaluated Jeffers' performance. (Pl. Aff. ¶ 13). At some point during Jeffers' employment, Hay instructed Jeffers to report to Andy Porter ("Porter") because Hay had too many people reporting directly to him; but Jeffers reported to Porter (whom he thought was a Maintenance Supervisor) for only a short time. (Pl. Dep. 64-65). According to Lafarge, Porter was a Maintenance Coordinator, and Jeffers reported to him for over four years, from November 1999 through May 2004. (Porter Aff. ¶¶ 3, 4, 5). When Porter left, Jeffers thought about asking whether he could replace him, but he did not pursue the matter because he was close to retirement. (Pl. Dep. 69).

### Quattlebaum is promoted

In October 2004, Quattlebaum was promoted to Porter's position of Maintenance Coordinator for the Harleyville Plant, and was to report directly to Hay. (Pl. Ex. 7; Def. Mem. Supp. Summ. J. 5-6; Stinson Aff. ¶ 17). Jeffers continued to report directly to Hay. (Pl. Dep. 67). Jeffers does not recall Hay ever telling him he was to report to Quattlebaum. (Pl. Dep. 65). Jeffers thought that Quattlebaum was leading up to replacing Porter, but that Quattlebaum was not qualified for the job. (Pl. Dep. 66-67). However, Jeffers admitted that Quattlebaum knew more than he did about the computer software program used by the maintenance department at Lafarge. (Pl. Dep. 139). Quattlebaum usually led the daily morning maintenance meeting. (Pl. Dep. 68).

After Quattlebaum became Maintenance Coordinator in October 2004, Jeffers and Quattlebaum continued to coordinate their activities with each other, and both coordinated their activities with the Electrical Coordinator, the Maintenance Planner, the Maintenance Manager,

and the Production Department.  (Pl. Dep. 67-68; Pl. Aff. ¶ 13).

In Jeffers' affidavit and his reply brief, Jeffers claims that the Maintenance Supervisors were also known as Maintenance Coordinators and that he was one of two Maintenance Coordinators.  (Pl. Aff. ¶ 9,13; Pl. Reply 5).  Quattlebaum was the other Maintenance Coordinator.  (Pl. Aff. ¶ 10).  After Jeffers began as Maintenance Coordinator, he supervised two maintenance employees (Pl. Dep. 38); when Lafarge operated the Plant, Jeffers supervised four employees.  (Pl. Dep. 39).  During 2004, Jeffers had two to three maintenance employees assigned to his crew.  (Pl. Dep. 96).  Because of attendance problems with two of those employees, Jeffers was supervising one employee, and cross training three others.  (Pl. Dep. 63).  Jeffers testified that Quattlebaum supervised an estimated fifteen or sixteen employees.  (Pl. Dep. 63).  Jeffers and Quattlebaum had a reciprocal agreement whereby they agreed to borrow and lend employees as their assignments required.  (Pl. Dep. 41).  Jeffers often supervised other maintenance employees than those who were directly assigned to him when his assignments required help from more employees.  (Pl. Dep. 45).  At times, Jeffers would supervise as many as thirty employees.  (Pl. Dep. 113).

### New management is brought in

According to Hoffman, while the upgrade of the Kiln Baghouse caused an improvement in the Harleyville Plaint's financial picture, the plant still was not meeting Lafarge's financial performance and cost reduction expectations.  (Hoffman Aff. ¶ 7)  Accordingly, Lafarge brought in managers familiar with its operational procedures and processes to ensure that the plant was using the most cost-effective processes for producing cement.  (Hoffman Aff. ¶ 7).  During 2004, Scarth MacDonnell ("MacDonnell") was brought in to the Harleyville Plant as the Operations

Manager; Terry Belland ("Belland") was brought in as the Optimization Manager; and Kyle

Harrison ("Harrison") was brought in as the Area Human Resource Manager for the Carolinas.

(Hoffman Aff. ¶ 8).  MacDonnell, Belland, and Harrison were trained on and familiar with

Lafarge's operational procedures.  (Hoffman Aff. ¶ 8).  They joined Plant Manager Tom Lesniak

"(Lesniak") and Hay, both of whom had handled their positions and responsibilities for

Lafarge's predecessor, Blue Circle.  (Hoffman Aff. ¶ 8).

### The December 2004 Organizational and Human Resource Review Process

In December 2004, Lafarge initiated the use of its Organizational and Human Resource

Review Process ("O&HR Review") at the Harleyville Plant to develop and plan a strategy for

improving operations at the facility.  (Hoffman Aff. ¶ 9).  The O&HR Review was a process

used at each Lafarge facility, but Lafarge had not been able to implement the process at the

Harleyville Plant until Harrison joined the management team there.  (Hoffman Aff. ¶ 9).

In December 2004, the O&HR Review was conducted at the Harleyville Plant, attended

by Hoffman, Lesniak, Harrison, MacDonnell, Belland, Hay, and Scott Morkem ("Morkem"), the

Vice President of Manufacturing for the Southeast Region.  (Hoffman Aff. ¶ 10; Morkem Aff. ¶

7, attached as Ex. 5 to Def. Mem. Summ. J.; Harrison Aff. ¶ 4, attached as Ex. 5 to Def. Mem.

Summ. J.).

At the O&HR Review in December 2004, each salaried employee was reviewed to

determine if a development plan were needed to ensure that each person was performing at the

expected level and had the skill set necessary to handle the responsibilities of his assignment.

During this review, there were no discussions regarding the need to eliminate any particular

positions or take any disciplinary actions against any salaried employee for performance

problems.  (Hoffman Aff. ¶ 11).  Hoffman recalled discussing Jeffers, who was the Maintenance

Supervisor over the Dust Collector Maintenance Crew.  (Hoffman Aff. ¶ 12; Ex. 1 to Hoffman

Aff.).  Morkem recalls discussing Jeffers' position as Maintenance Supervisor over the Dust

Collector Repair Crew, and how the position was created prior to the Kiln Baghouse upgrade to

manage the workload on the old system.  (Morkem Aff. ¶ 7).  By the end of 2004, Jeffers' crew

had dropped to two full-time Maintenance Technicians, and Morkem did not know of any other

supervisor at a Lafarge facility who had a crew of only two people.  (Morkem Aff. ¶ 9).

However, at that time, there was no discussion regarding the need to eliminate Jeffers' position.

(Hoffman Aff. ¶ 12; Morkem Aff. ¶ 10).  At this meeting, the eight other salaried employees

working in the Maintenance Department also were discussed:  William Barton, Kirby Knight,

Wilbur Pendarvis, Bart Quattlebaum, Hubert Shieder, David Stinson, Ellis Thigpen, and Murphy

Tollison.  (Hoffman Aff. ¶ 13).

According to Lafarge, in 2004 and continuing into January 2005, the Harleyville Plant

failed to significantly improve its economic performance.  (Morkem Aff. ¶ 11).  Morkem and

Hoffman discussed the possibilities of improving the Harleyville Plant's economic performance

by replacing employees who had poor work performance and eliminating unnecessary positions.

(Morkem Aff. ¶ 11; Hoffman Aff. ¶¶ 16-18).

Hoffman contacted Harrison near the end of December 2004 and asked him to put

together a list of employees who had performance problems or who were working in positions

that could be eliminated.  (Harrison Aff. ¶¶ 5-6; Hoffman Aff. ¶¶ 18-19).  Harrison testified that

Hoffman wanted him to include information such as race, sex, date of birth, seniority date salary,

and any other information relevant to the individual that would allow Lafarge to analyze any

risks or liabilities associated with taking an employment action involving individuals on the list. (Harrison Aff. ¶¶ 5-6; Hoffman Aff. ¶ 19).  Harrison swears that neither he nor Hoffman discussed identifying employees based on their age.  (Harrison Aff. ¶ 6).  Hoffman testified that in asking Harrison to put this information together, he was not asking Harrison to identify older employees who could be discharged for performance or who could have their positions eliminated, because Hoffman was 57 years old, and because of his own age, he "made sure that any analysis or decision made regarding the employees at Harleyville did not have an adverse impact on older employees."  (Hoffman Aff. ¶ 20).

In late December 2004 or early January 2005, Harrison prepared a list of nine employees who had performance issues in handling their jobs or who were filling positions that could be eliminated:  James Danny Coggins, Logan Mizzell, Ronald Brown, Ted Henderson, Daniel Boyd, Jerry "Pete" Bazzle, James Jeffers, Ellis Thigpen, and Clarence Simmons.  (Harrison Aff. ¶ 7 and Ex. 1 thereto; Hoffman Aff. ¶ 21 and Ex. 2 thereto; *see also* Pl. Ex. 21).

Harrison's narrative regarding Jeffers states in full:

Issues:
Jim is currently a Maintenance Coordinator assigned a two person crew working on the plant's dust collectors.  Jim's health is in poor condition and is a concern from a liability standpoint.  The validity of a Coordinator exclusive for dust collection is also in question. I would recommend Jim be considered for a Disability Retirement.  Estimated Cost $32,355.50 (calculated on STD).

The replacement for this position is subject to change, but initial planning would be to eliminate this position.  This would be a [sic] considered a reduction in the workforce, by eliminating one position.

(Harrison Ex. 1; Hoffman Ex. 2; Pl. Ex. 21).

Harrison included Jeffers on the list because he was in a maintenance position supervising the plant's Dust Collector Repair Crew and Jeffers had only two full-time

maintenance technicians assigned to his crew. (Harrison Aff. ¶ 8). Harrison knew that Lafarge had spent $5,000,000.00 upgrading the Kiln Baghouse, which had caused a reduction in the amount of maintenance and repair work that was needed on the dust collection equipment in that area, and he listed Jeffers as someone in a position that could be eliminated because the work he and his crew were performing could be transferred to other employees already working in the Maintenance Department. (Harrison Aff. ¶ 8). Harrison did not have any authority to make a final decision regarding any employee and he did not share his list with anyone except Hoffman. (Harrison Aff. ¶¶ 9-10).

Hoffman received Harrison's list in late December 2004 or early January 2005. (Hoffman Aff. ¶ 21). He reviewed the list and noticed that it contained the names of seven salaried employees (James Danny Coggins, Logan Mizzell, Ronald Brown, Ted Henderson, Daniel Boyd, James Jeffers, and Ellis Thigpen), and two hourly employees (Jerry "Pete" Bazzle and Clarence Simmons). (Hoffman Aff. ¶ 22). At the time Hoffman received the list, he did not review it to determine the exact persons on the list, but only wanted to determine the potential number of employees who could be affected by a reorganization and evaluate the best strategy for moving forward with a reorganization. Hoffman testified that if Harrison's list had indicated that there were no positions that could be eliminated and only two employees who needed to be replaced for poor work performance, Hoffman would not have looked at developing a detailed reorganization that involved providing severance benefits to the affected individuals. (Hoffman Aff. ¶ 23).

## The Kiln Tyre Crack

On February 9, 2005, the Kiln Tyre at the Harleyville Plant[5] cracked, which Morkem described as a "catastrophic equipment failure." (Morkem Aff. ¶ 12). This caused a loss of revenue as well as an increase in operational and maintenance costs. (Morkem Aff. ¶ 12; Hoffman Aff. ¶ 29). Cement production was shut down for almost two months; each day of lost production cost the Harleyville Plant approximately $200,000.00. (Hoffman Aff. ¶ 29). The total cost associated with addressing this equipment failure amounted to about $1,550,000.00 more than the estimated 2005 budget for the plant. (Morkem Aff. ¶ 15). The Kiln Tyre crack put additional financial pressures on the Harleyville Plant and caused Hoffman and Morkem to move forward with implementing a reorganization to reduce costs as soon as possible, which meant replacing employees who had performance problems and eliminating any unnecessary positions. (Morkem Aff. ¶ 13; Hoffman Aff. ¶ 30). After this incident, Harrison and MacDonnell discussed the need to restructure the Harleyville plant. (MacDonnell Dep. at pp. 14-17, attached as Ex. 20 to Pl. Mem. Opp'n; MacDonnell Aff. ¶ 6, attached as Ex. 6 to Def. Mem. Summ. J). Harrison asked MacDonnell to evaluate the employees working in the Production and Maintenance Department, all of whom were under his supervision. (MacDonnell Aff. ¶ 6). Harrison asked MacDonnell to identify any poor performers, or persons whose jobs could be eliminated, but did not indicate to MacDonnell that certain persons already had been identified. (MacDonnell Aff. ¶ 7).

---

[5]     The Kiln Tyres are large bands of metal that surround the Kiln and allow the Kiln to rotate and move product through the conversion process. There are three Kiln Tyres on the Harleyville Kiln; each is approximately 15 feet in diameter. (Def. Mem. Summ. J. 8, n.4).

### The March 2005 Meeting in Alpharetta, Georgia

In order to address the need to immediately reduce costs at the Harleyville Plant, a meeting was scheduled for early March 2005 at the Lafarge corporate offices in Alpharetta, Georgia. (Hoffman Aff. ¶ 31). Attending were MacDonnell, Belland, Harrison; Hoffman, and Morkem. (Harrison Aff. ¶11; Hoffman Aff. ¶ 32; Morkem Aff. ¶ 13). During the meeting, the group decided to plan a specific reorganization of the Harleyville Plant, which involved replacing employees who were not meeting performance expectations or who were in positions that could be eliminated. (Harrison Aff. ¶11; Hoffman Aff. ¶ 33; Morkem Aff. ¶ 13). Harrison specifically attributes the reorganization plan to the Kiln Tyre crack that occurred on February 9, 2005. (Harrison Aff. ¶ 11). Harrison testified that at this meeting, MacDonnell recommended that Jeffers' position be eliminated. (Morkem Aff. ¶ 14). The recommendation was reviewed and it was confirmed that Jeffers, as Maintenance Supervisor over the Dust Collector Crew had no more than two maintenance technicians assigned to him on a full-time basis as part of his crew. Jeffers was not managing or directing a full maintenance crew, and it was decided that Jeffers' position could be eliminated and his duties could be transferred to other maintenance employees. They concluded that Quattlebaum could assume all of the duties and responsibilities being performed by Jeffers, and still continue to perform the duties he already was handling. (Morkem Aff. ¶ 14).

Six other employees also were identified as needing to be replaced or in positions that could be eliminated: James Danny Coggins, Logan Mizzell, Ronald Brown, Ted Henderson, Daniel Boyd, and Don Hay. (Harrison Aff. ¶ 11). This list differed from Harrison's list in that it included Maintenance Manager Don Hay, but did not include Ellis Thigpen, Jerry "Pete" Bazzle,

or Clarence Simmons.  (Harrison Aff. ¶ 12).

Management representatives from the Harleyville Plant presented a report analyzing all of the economic and business factors impacting that plant.  (Ex. 3, Hoffman Aff.).  As a result of the information discussed at that meeting, the Harleyville Plant management representatives were asked to put together a final plan for reorganization that would include discharging employees with poor performance and eliminating unnecessary positions.  (Hoffman Aff. ¶ 34; Morkem Aff. ¶ 15).

On or around March 20, 2005, the management representatives from the Harleyville Plant prepared a document entitled "Revised Objectives and Operating Plan for Remainder of 2005" (the "Revised Operating Plan") which set forth the actions needed to improve economic performance and reduce costs at the Harleyville Plant.  (Morkem Aff. ¶ 15; Ex. 1, Morkem Aff.; Ex. 4, Hoffman Aff.).  MacDonnell assisted in the preparation of the Revised Operating Plan. (MacDonnell Aff. ¶ 8; Ex. 1, MacDonnell Aff.).  Jeffers' position was evaluated.  (MacDonnell Aff. ¶ 9; Morkem Aff. ¶ 16).  The Revised Operating Plan recommended the elimination of seven positions, including Jeffers' position, which was referred to as "Dust Collector Coordinator."  (Ex. 1, Morkem Aff.; Ex.1, MacDonnell Aff.; Ex. 4, Hoffman Aff.).  With respect to Jeffers' position, the Revised Operating Plan stated:

> *Dust Collector Coordinator* – Position not to be filled.  Two dust collector repairmen become part of the regular crew and Bart Quattlebaum has opportunity to reestablish procedures, job training and responsibilities.

(Ex. 1, Morkem Aff.; Ex.1, MacDonnell Aff.; Ex. 4, Hoffman Aff.).  MacDonnell recommended the elimination of Jeffers' job, based on his evaluation of Jeffers' position and the need to reduce maintenance costs at the Harleyville Plant.  (MacDonnell Aff. ¶ 9; Harrison Aff. ¶ 14).

MacDonnell testified that Jeffers managed only two Maintenance Technicians on a full-time

basis and it seemed "clear" that Jeffers' position could be eliminated and his crew could be

combined with the existing plant maintenance crew.  (MacDonnell Aff. ¶ 9).  The decision to

eliminate Jeffers' job would save the Harleyville Plant almost $65,000.00 on an annual basis.

(Morkem Aff. ¶ 16).  Prior to deciding to eliminate Jeffers' job, MacDonnell had been working

on a cross-training program for maintenance employees at the plant.  Instead of specific teams to

perform dust collection or other specific maintenance, the employees were trained to be capable

of performing various maintenance duties, in order to reduce costs.  (MacDonnell Aff. ¶ 10).

### Jeffers' Termination

On March 31, 2005, Jeffers met with Harrison and MacDonnell, who informed him that

he was being terminated effective April 1, 2005 because his job was being eliminated.  (Pl. Dep.

21, 103, 109, 121, 137-138; Pl. Aff. ¶ 14; MacDonnell Aff. ¶ 11; Harrison Aff. ¶ 16).

MacDonnell testified:  "We told him that his position was being eliminated.  It was part of a

restructuring moving forward and that he was in a position that was being eliminated[.]"

(MacDonnell Dep. 35-36, attached as Ex. 20 to Plaintiff's Mem. Opp'n).  MacDonnell further

testified:  "In the meeting I told Jeffers that his position was being eliminated and would not be

replaced."  (MacDonnell Aff. ¶ 11).  Jeffers was terminated shortly before his sixty-first

birthday.  (Pl. Dep. 141-42; Pl. Aff. ¶ 17).  At the same time that Jeffers was terminated, six

other individuals were also terminated, all of whom were over the age of fifty at the time of the

termination.[6]  (Pl. Aff. ¶ 14).  Jeffers admits that after he was terminated and his position was

---

[6]     Jeffers listed the six as:  Don Hay (Maintenance Manager), Ronald Brown
(Supervisor), Ted Henderson (Shift Supervisor), Daniel Boyd (Utility
Supervisor), Logan Mizzell (Shipping Supervisor), and Danny Coggins

eliminated, there was one less supervisor working in the Maintenance Department. (Pl. Dep. 22). At the time Jeffers was terminated, Quattlebaum was the other Maintenance Coordinator in the Maintenance Department. (Pl. Dep. 63). Lafarge reorganized the Maintenance Department by assigning Jeffers' two employees to the Maintenance Execution team managed by Quattlebaum. (MacDonnell Aff. ¶ 11).

Jeffers subsequently filed this complaint. Jeffers contends that while his job title was eliminated (Pl. Dep. 121), his position was not eliminated "because somebody else is performing the same work that I did." (Pl. Dep. 104). Jeffers testified that his work was "passed on to" Quattlebaum (Pl. Dep. 104), or "transferred" to Quattlebaum (Pl. Aff. ¶ 15), who was twenty-eight years old at the time of Jeffers' termination. (Pl. Mem. Opp'n 8). Jeffers contends that he and Quattlebaum held the same position at the time he was terminated in March 2005. (Pl. Dep. 63; Pl. Aff. ¶ 10). Nevertheless, Quattlebaum, who was younger, was retained and Jeffers was terminated. (Pl. Dep. 105; Pl. Aff. ¶¶ 11, 15).

### Summary Judgment Standard

Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id., *quoting* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct.

---

(Laboratory Supervisor). (Pl. Dep. 102).

2505, 91 L.Ed.2d 202 (1986).  "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."  Ross v. Comm'ns Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  The defendant, as the moving party, bears the initial burden of pointing to the absence of a genuine issue of material fact.  Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991), *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  If the defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact."  Id. at 718-19, *citing* Anderson v. Liberty Lobby, 477 U.S. at 247-48.  "[O]nce the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial."  Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992).  The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Id. and Doyle v. Sentry Ins., 877 F.Supp. 1002, 1005 (E.D.Va. 1995).  Instead, the non-moving party is required to submit evidence of specific facts by way of affidavits (*see* Fed.R.Civ.P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial.  Baber, *citing* Celotex Corp., *supra*.  Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) *and* De Leon v. Saint Joseph Hosp. Inc., 871 F.2d 1229, 1233 n. 7 (4th Cir. 1989).  Unsupported hearsay evidence is

insufficient to overcome a motion for summary judgment.  Evans v. Technologies Applications & Servs. Co., 80 F.3d 954, 962 (4th Cir. 1996) (citation omitted).  In addition, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).  Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion."  Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

### The legal standard for analyzing Jeffers' age discrimination claim

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  A plaintiff can prove an ADEA violation "(1) under ordinary principles of proof using any direct[7] or indirect evidence relevant to and sufficiently probative of the issue, or (2) under a judicially created proof scheme originally used in the Title VII context in McDonnell Douglas Corp. v. Green . . .and subsequently adapted for use in ADEA cases."  Burns v. AAF-McQuay, Inc., 96 F.3d 728, 731 (4th Cir. 1996)

---

[7]    The Fourth Circuit defines "direct evidence" as evidence that the employer "announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor . . ."  Cline v. Roadway Express, Inc., 689 F.2d 481, 485 (4th Cir. 1982) (citing Spagnuolo v. Whirlpool Corp., 641 F.2d 1109, 1113 (4th Cir.), cert. denied, 454 U.S. 860 (1981)).  In other words, direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision."  Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995), abrogated on other grounds, Desert Palace, Inc. v. Costa, 539 U.S. 90, 95, 123 S.Ct. 2148, 2152, 156 L.Ed.2d 84 (2003) (evidentiary standard for mixed-motive jury instruction).

(citations omitted).[8]  In ADEA cases, the Fourth Circuit permits plaintiffs to use the three-stage

scheme of proof originally formulated for Title VII cases.  Herold v. Hajorca Corp., 864 F.2d

317, 319 (4th Cir. 1988).

        First, Lafarge contends that Jeffers does not have direct evidence of discrimination.  (Def.

Mem. Summ. J. 14-15).  Jeffers admits that no one in Lafarge management ever told him that he

was being terminated because of his age (Pl. Dep. 110), but concludes that his age is the only

reason he could have been terminated.  As Jeffers stated:  "I have no idea other than my age.  I

could not come up with a reason why the company I worked for for 30 years would do that."

(Pl. Dep. 111).  Jeffers argues that he, as well as the other six terminated employees, were in a

protected age group, and presumably earned higher salaries than the younger employees would

be receiving.  Jeffers argues that this evidence compels the conclusion that he was terminated

because of his age.  (Pl. Dep. 110).  Jeffers' speculation, standing alone, does not constitute

evidence that his age was a motivating factor in his termination.  In order to survive a properly

supported motion for summary judgment in a discrimination case, a plaintiff must "present

---

        [8]        As the Fourth Circuit recently noted in Ilozor v. Hampton Univ., 2008 WL
                2824952 at *5, n.7 (4th Cir. July 23, 2008) (unpublished per curiam opinion):

                        We have not yet decided whether an ADEA plaintiff who lacks direct
                        evidence of discrimination may proceed under the mixed motive approach
                        [established by the Supreme Court in Price Waterhouse v. Hopkins, 490
                        U.S. 228 (1989).].  See, e.g., Hill v. Lockheed Martin Logistics Mgmt.,
                        Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc) (reserving question).
                        Two Circuits have split on the question.  Compare Rachid v. Jack in the
                        Box, Inc., 376 F.3d 305 (5th Cir. 2004) (holding that ADEA plaintiff may
                        present direct or circumstantial evidence of discrimination to warrant
                        mixed-motive analysis) with Monaco v. American General Assurance Co.,
                        359 F.3d 296, 300 (3d Cir. 2004) (stating that ADEA plaintiff must
                        present direct evidence of discrimination to warrant mixed-motive
                        analysis).

substantial evidence to support as a reasonable probability, rather than a mere possibility" that discrimination occurred.  DeJarnette v. Corning, Inc., 133 F.3d 293, 298 (4th Cir. 1998). "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence[.]" Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted).

Jeffers has elected to use the "pretext" framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 804-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to prove his case.  (Pl. Mem. Opp'n 11).  In order to make out a prima facie case under the ADEA in a reduction in force ("RIF") situation, such as the one at bar, the plaintiff must show:  (1) that he is in the protected age group; (2) that he was discharged; (3) that at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) that persons outside the protected age class were retained in the same position or that there was some other evidence that the employer did not treat age neutrally in deciding to dismiss the plaintiff.[9] Herold v. Hajoca Corp., 864 F.2d 317, 319-20 (4th Cir. 1988) (citation omitted), citing EEOC v. Western Elec. Co., 713 F.2d 1011, 1014-15 (4th Cir. 1983)).

After the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the termination.  Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 513-14 (4th Cir. 2006), citing Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004).  The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120

---

[9]     The parties agree that this is the appropriate test with respect to cases brought pursuant to the ADEA and involving a RIF.  (See Pl. Mem. Opp'n 13 and Def. Reply 1).

S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal quotation marks and citation omitted).  If the employer meets this burden, "the presumption of discrimination created by the prima facie case disappears from the case" and the plaintiff must prove that the "proffered justification is pretextual."  Mereish, 359 F.3d at 334; *see also* Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  Under the "pretext" framework, a plaintiff must demonstrate than an employer's purported reason for making an adverse employment action is actually a pretext for discrimination.  Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc).

### The Prima Facie Case

Lafarge has conceded the first three elements of Jeffers' prima facie case:  (1) Jeffers was over forty years of age and a member of a protected class; (2) he was qualified for his position and met Lafarge's legitimate expectations; and (3) he was discharged despite his qualifications and performance.  (Def. Mem. Summ. J. 16).  The issue here is whether Jeffers has presented evidence sufficient to raise a genuine issue of material fact as to the fourth element:  whether a person outside the protected age class was retained in the same position or that there was some other evidence that the employer did not treat age neutrally in deciding to dismiss the plaintiff. Herold v. Hajoca Corp., 864 F.2d at 319.

Lafarge contends that Jeffers cannot prove the fourth element of his prima facie case because he cannot produce sufficient evidence to show he was replaced by a substantially younger individual with comparable qualifications.  (Def. Mem. Summ. J. 16).  Lafarge argues that after Jeffers was terminated, his work was transferred to Quattlebaum, but he was not replaced by Quattlebaum.  (Def. Mem. Summ. J. 16-17).

**The fourth prong of the prima facie case**

<u>Whether Jeffers and Quattlebaum were in the same job position</u>

Jeffers asserts that he has established the fourth prong of his prima facie case because he has produced sufficient evidence from which a reasonable jury could conclude that Quattlebaum, who was 28 years old and thus outside the protected age class, was retained in the same position from which Jeffers was terminated. (Pl. Mem. Opp'n 15-16, 19, 23). In support of his argument that he and Quattlebaum had the same job position, Jeffers notes that Lafarge admits that his title at the Harleyville Plant was Maintenance Supervisor. (Pl. Mem. Opp'n 15, *citing* Def. Mem. Summ. J. 3, *in turn citing* Pl. Dep. 38). Jeffers argues that (1) he and Quattlebaum both were Maintenance Supervisors (Pl. Dep. 63); (2) Jeffers and Quattlebaum coordinated their projects with each other (Pl. Dep. 67); (3) the title Maintenance Supervisor was interchangeable with the title Maintenance Coordinator; and (4) no testimony was elicited from Jeffers during his deposition to show that there was any difference between those two jobs. (Pl. Mem. Opp'n 16). Therefore, he and Quattlebaum held the same position at the time Jeffers was terminated in March 2005. (Pl. Mem. Opp'n 7, 16-17).

As additional evidence that Jeffers and Quattlebaum held the same job, and even if Lafarge contends that Quattlebaum was, in fact, a Maintenance Coordinator, Jeffers argues that Lafarge's own personnel documents indicate that Jeffers was also a Maintenance Coordinator (Pl. Ex. 15) and Lafarge's internal O&HR documents reflect that both he and Quattlebaum were Maintenance Coordinators (Pl. Ex. 12; 15), thus proving that they held the same job. Moreover, Jeffers' final performance evaluation at Lafarge lists his position as Maintenance Coordinator.

(Pl. Ex. 13).[10]  In addition, documents reflecting Jeffers' salary changes refers to Jeffers as a Maintenance Coordinator.  (Pl. Ex. 14).  Jeffers also supports his argument that he and Quattlebaum had the same job (Pl. Mem. Opp'n 24) by presenting evidence that Jeffers did not report to Quattlebaum as a supervisor, and Quattlebaum did not review Jeffers' performance.  (Pl. Mem. Opp'n 18).  Jeffers contends that the fact that he and Quattlebaum held the same position is material because it evidences Lafarge's intentional discrimination against Jeffers.

Jeffers' claim that he and Quattlebaum had the same job appears to be largely based upon his argument that he and Quattlebaum may have had the same job title, but not the same job duties and responsibilities.  Jeffers' testimony indicated that he knew very little about Quattlebaum's job duties.  Quattlebaum has not testified, either through deposition or affidavit, as to his job duties and responsibilities.  Indeed, there is no evidence that Jeffers and Quattlebaum did, in fact, have the same job duties.  Jeffers admitted he did not know much about Quattlebaum's position after Quattlebaum was moved into Porter's Maintenance Coordinator position, but admits Quattlebaum was the maintenance person most responsible for participating in the daily meetings between maintenance and production.  (Pl. Dep. 68).  The evidence shows that Quattlebaum was supervising 15 or 16 employees, while Jeffers was supervising one and cross-training three others.  The evidence further shows that Porter had been Jeffers' supervisor, and Quattlebaum had assumed Porter's position.  Jeffers never testified that he and Porter had the same position; in fact, he considered applying for Porter's position, which is evidence that it

---

[10]    Jeffers argues that his performance evaluations had listed his job title as Maintenance Coordinator consistently since 1995.  The Court does not find this longitudinal record to be persuasive evidence because, as Lafarge correctly observes, some of the documents upon which Jeffers relies were created by Lafarge's corporate predecessors.  (Def. Reply 7, n.1).

was a different job position than what he had.  Since Quattlebaum assumed Porter's position, and

Porter was Jeffers' supervisor, Jeffers and Quattlebaum could not have the same job position.  In

sum, it does not appear that Jeffers and Quattlebaum had the same job duties, or the same job.

<u>Whether the record reflects "uncontradicted evidence" of age discrimination</u>

Next, Jeffers contends that the "uncontradicted evidence" shows that his position was

eliminated instead of Quattlebaum's because of Jeffers' age.  (Pl. Mem. Opp'n 19).  Jeffers

argues that the fact that Lafarge was cross training employees shows that it was completely

reorganizing the Maintenance Department, and he contends that he could have been retained in

the reorganization, and Quattlebaum could have been terminated, but that Lafarge did not treat

age neutrally, and terminated Jeffers, while retaining the younger employee, Quattlebaum.  (Pl.

Mem. Opp'n 19, 21).  Jeffers contends that the fact that all of the employees terminated by

Lafarge in its RIF were over fifty strongly suggests that Lafarge did not treat age neutrally.  (Pl.

Mem. Opp'n 22).

Jeffers' argument, however, overlooks the fact that the upgrade of the Kiln Baghouse

eliminated the need for a dust collection supervisor and thus meant that Jeffers' job position was

eliminated.  The Court does not agree that the record reflects "uncontradicted evidence" of age

discrimination.

<u>Whether Jeffers should have been retained as the more qualified employee</u>

Jeffers contends he was more qualified than Quattlebaum and should have been retained.

Jeffers notes that his performance record at the Harleyville Plant was excellent, and he had

approximately ten years' experience as a Maintenance Coordinator and twenty additional years'

experience at the Harleyville Plant.  (Pl. Aff. ¶ 15; *see also* Pl. Opp'n Mem. 8-9, n.67 (listing

Jeffers' various performance appraisals)).  Furthermore, Jeffers contends he had extensive

training as a supervisor and in areas relevant to his work at the Harleyville Plant.  (Pl. Aff. ¶ 8;

*see also* Pl. Mem. Opp'n 9, n.68 (listing Jeffers' various workshop and seminar certificates)).  As

additional evidence that Jeffers was more experienced than Quattlebaum, he alleges that

throughout his thirty-year career at the Harleyville Plant, Jeffers was directly or indirectly

involved in the Maintenance Department (Pl. Aff. ¶ 2), and had supervised many employees.

(Pl. Mem. Opp'n 21).  In contrast, Quattlebaum had started with Lafarge in 2001, he had four

years' total experience at the Harleyville Plant, he had only had seven months' experience as a

Maintenance Coordinator at the time of Jeffers' termination, and he had been supervising

employees for only a short period of time.  (Pl. Ex. 5, 7).  Thus, Jeffers argues that whether he

was qualified to hold the remaining Maintenance Coordinator position is a question for a jury

and cannot be resolved on summary judgment.  (Pl. Mem. Opp'n 19).

    Jeffers' argument that he should have been retained and Quattlebaum terminated is

dependent upon Jeffers having establishing the requirements for Quattlebaum's position and

showing that he was qualified for Quattlebaum's position.  However, as discussed above, Jeffers

admitted that he never talked to Quattlebaum about Quattlebaum's maintenance position, his job

title, his role or his responsibilities.  (Pl. Dep. 69).  Without this information, he cannot show

evidence that he was qualified to perform Quattlebaum's position.  Lafarge, however, has

presented affidavits from Harrison and MacDonnell which confirm that Jeffers would not have

been qualified to handle all of the duties and responsibilities associated with the maintenance

work being handled by Quattlebaum during the time Jeffers' position was eliminated.  (Harrison

Reply Aff. ¶¶ 3-9; MacDonnell Reply Aff. ¶¶ 3-11, attached to Def. Reply).

Jeffers also relies on <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1529 n.9 (11th Cir. 1987) to support his position that he should have been retained while Quattlebaum should have been terminated. Jeffers contends that the relative qualifications of the two men should be decided by a jury, citing the language in <u>Rollins</u> to the effect that "Whether Rollins could have done the work, however, is a question for the fact finder at trial rather than one that can be resolved on summary judgment." <u>Rollins</u>, 833 F.2d at 1529 n.9. <u>Rollins</u>, however, is factually distinguishable from the present case. The plaintiff in <u>Rollins</u> had to teach her eventual replacement (Richardson) her job. The <u>Rollins</u> plaintiff also contended that she possessed the qualifications necessary to do the work currently performed by Richardson; the plaintiff's evidence included a copy of the ad announcing the opening ultimately filled by Richardson. The ad asked that applicants have either a business degree or four years of accounting experience. Rollins possessed the stated work experience. Rollins contended that TechSouth, intending to fire her, restructured and re-labeled her position, hired someone else to fill it, had her train that person, and then terminated her. The court of appeals concluded that "Rollins has articulated specific facts from which one could infer that Richardson actually replaced her. Consequently, we find that appellant has met her burden of presenting a prima facie case." <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d at 1529.

In the present case, however, there is absolutely no evidence that Jeffers trained Quattlebaum in his job, or that Jeffers had Quattlebaum's college degree (Pl. Ex. 5), or that Quattlebaum was hired to replace Jeffers. Thus, Jeffers' reliance on <u>Rollins</u> is inapposite to the case at bar.

<u>Whether Quattlebaum replaced Jeffers when he assumed Jeffers' job duties</u>

Jeffers next argues that the fourth prong of his prima facie case is met because "the maintenance duties and responsibilities he was handling were transferred over to Bart Quattlebaum who was already working in the Maintenance Department as Maintenance Coordinator." (Def. Mem. Summ. J. 16, *citing* Morkem Aff. ¶ 14). Lafarge contends that Jeffers' duties and responsibilities were transferred to Quattlebaum, who already was working in the Maintenance Department as Maintenance Coordinator. (Morkem Aff. ¶ 14). Lafarge argues that Jeffers' position was eliminated because his duties were no longer needed and thus his position did not need to be refilled. (Morkem Aff. ¶ 16).

To the extent that Jeffers asserts that he was replaced by a substantially younger employee through the transfer of job duties to Quattlebaum, Jeffers' argument is without merit. In <u>Causey v. Balog</u>, 162 F.3d 795 (4th Cir. 1998), the court held that an ADEA plaintiff who was terminated as part of a RIF failed to show that his employer "filled" his position with someone outside his protected class when his evidence acknowledged that the duties of his former position were split by his employer between two other divisions. <u>Causey</u>, 162 F.3d at 802. Thus, the plaintiff in <u>Causey</u> failed to establish the fourth prong of his prima facie case. Likewise, the transfer of Jeffers' duties to Quattlebaum does not establish the fourth prong of Jeffers' prima facie case.

<u>The age of the person who decided to terminate Jeffers</u>

Jeffers argues that Harrison, who was born in 1975, was the person who "selected [him] for termination." (Harrison Aff. ¶ 1; Pl. Mem. Opp'n 27). Jeffers overstates Harrison's role. In fact, Harrison specifically testified that he "did not have the authority to make a final decision on

anyone." (Harrison Aff. ¶ 9). Harrison was 29 years old when, at Hoffman's request, he compiled the list of persons who were underperforming or whose jobs could be eliminated. (Harrison Aff. ¶¶ 1, 2, 4-7). Harrison testified that he included Jeffers on the list not because of his age, but because Jeffers was in a maintenance position supervising the plant's Dust Collector Repair Crew and was assigned only 2 full-time maintenance technicians to his crew; he also knew that the Kiln Baghouse upgrade had resulted in a reduction in the amount of maintenance and repair work that was needed on the dust collection equipment in that area. (Harrison Aff. ¶ 8). Harrison listed Jeffers because the work he and his crew were performing could be "easily transferred over to other employees already working in the Maintenance Department." (Harrison Aff. ¶ 8). The evidence shows that while Harrison analyzed the employees and the Harleyville Plant, and at Hoffman's request, prepared a list of employees who were underperforming or in positions that could be eliminated, Harrison did not have final decision-making authority.

Lafarge contends, and the Court agrees, that the decision maker in the present case was Hoffman, who was 58 years old when he approved the Harleyville Plant reorganization. (Hoffman Aff. ¶ 41). Hoffman testified that he would never have approved the elimination of Jeffers' position if he had thought that age had played any factor in that decision. (Hoffman Aff. ¶ 41). Hoffman testified that after the December 2004 O&HR Review, he asked Harrison to prepare a list of employees who were underperforming or in a position that could be eliminated. (Hoffman Aff. ¶ 19). Jeffers was on Harrison's list. (Hoffman Aff. ¶¶ 21-22). Hoffman avers that he was only interested in the potential number of employees that could be affected by a reorganization, and that each of the persons listed was, in fact either underperforming or in a position that could be eliminated. (Hoffman Aff. ¶¶ 23, 25). Hoffman states that in evaluating

the persons on the list and the information regarding the age of the Harleyville Plant workforce, he noted that the plant had opened in 1974 and "a majority of the individuals working at that Site had worked there since the plant opened.  For this reason, a majority of the employees working at the Harleyville facility were well over 40 years of age." (Hoffman Aff. ¶ 24).  Hoffman concluded that those individuals on the list had not been selected due to age.  (Hoffman Aff. ¶ 24).  Hoffman wanted to get an idea of what to expect regarding severance or pension benefits if employees were separated from Lafarge and used this information to develop a reorganization plan, although there was no plan approved by Lafarge during January 2005.  (Hoffman Aff. ¶¶ 26-28).

**Even if Jeffers were replaced, he was replaced by an individual of the same age**

According to Lafarge, after Jeffers' position was eliminated on March 31, 2005, it has not refilled or reactivated a maintenance supervisory position primarily responsible for dust collection repair and the other specific duties and responsibilities handled by Jeffers at the time his position was eliminated.  (Def. Mem. Summ. J, *citing* MacDonnell Aff. ¶ 13).  However, since Jeffers' termination, a different set of maintenance demands have arisen at the Harleyville Plant which required Lafarge to re-institute a supervisory position in the Maintenance Department.  This position entailed overseeing all maintenance responsibilities at the Harleyville Plant, not just dust collection repair work or the specific items Jeffers handled in his position. (MacDonnell Aff. ¶ 13).

Lafarge hired Larry Smith ("Smith") into this re-instituted Maintenance Supervisor position in November 2005, about seven months after Jeffers' position was eliminated. (MacDonnell Aff. ¶ 13).  MacDonnell approved Smith's hire; according to Lafarge, MacDonnell

was the same person who had recommended that Jeffers' position be eliminated.  At the time

MacDonnell approved Smith's hiring into this re-instituted Maintenance supervisory position,

Smith was 58 years old.  (MacDonnell Aff. ¶ 13).  In comparison, when Jeffers was notified that

his position was being eliminated on March 31, 2005, he was 59 years old.  Lafarge thus reasons

that even if the Court finds that Jeffers was replaced by Smith, it is undisputed that he was

replaced by an individual who was exactly one year younger (58 years versus 59 years old).

Lafarge argues that as a matter of law, its decision to replace Jeffers with an individual so close

in age does not allow Jeffers to establish the replacement element as required to show a prima

facie case of age discrimination.

In O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312, 116 S.Ct. 1307,

134 L.Ed.2d 433 (1996) the Supreme Court clarified that a plaintiff can make out a prima facie

claim for discriminatory discharge under the ADEA even if the replacement employee also falls

within the ADEA's protective scope.  Nevertheless, the Supreme Court suggested that

replacement by a "substantially younger" individual is a better indicator of age discrimination.

See id. at 313, 116 S.Ct. 1307.  However, Lafarge contends that Smith did not "replace" Jeffers

because Lafarge has not reactivated a maintenance supervisory position primarily responsible for

dust collection repair or the other duties for which Jeffers was responsible.  Instead, Smith was

hired into a different supervisory maintenance job.  (Def. Mem. Summ. J. 18-19; MacDonnell

Aff. ¶ 13).  Thus, it cannot be said that Smith "replaced" Jeffers because Smith was hired into a

different job than that occupied by Jeffers.  Moreover, the fact that a plaintiff is replaced by a

member of the ADEA's protected class strongly suggests a conclusion that his termination was

unrelated to his age.  Martin v. Patrick Indus., Inc., 478 F.Supp.2d 855, 859 (M.D.N.C. 2007),

*aff'd*, 266 Fed. Appx. 271 (4th Cir. 2008) (per curiam).

In conclusion, for all of the reasons discussed above, Jeffers has failed to carry his initial burden of establishing a prima facie case of age discrimination. *See* McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. Nevertheless, the Court will continue its analysis of the case by discussing the second part of the burden-shifting paradigm set forth in McDonnell Douglas.

**Whether Lafarge has articulated a non-discriminatory reason for termination**

Assuming that Jeffers had established a prima facie case, thus giving rise to an inference of discrimination, then the burden would shift to the defendant to provide a legitimate non-discriminatory reason for its action. McDonnell Douglas, 411 U.S. at 802-04, 93 S.Ct. 1817; Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995) (applying McDonnell Douglas to ADEA claims). Lafarge's burden "is one of production, not persuasion; it can involve no credibility assessment." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 514 (4th Cir. 2006) (*quoting* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). If the defendant proves evidence of a non-discriminatory reason for its action, then Jeffers bears the ultimate burden of persuasion and must show, by a preponderance of the evidence, that the proffered reason was pretextual or otherwise unworthy of credence. Henson, 61 F.3d at 275 (internal quotation marks and citations omitted).

Lafarge has articulated a legitimate, non-discriminatory reason for terminating Jeffers: to reduce costs. (Def. Mem. Summ. J. 20-22). Lafarge has set forth undisputed evidence that the decision to eliminate Jeffers' position was supported by legitimate and economic considerations. As Lafarge argues, from the time it purchased the Harleyville Plant in 2001, one of its primary goals was to reduce maintenance costs and expenses. (Hoffman Aff. ¶4; Morkem Aff. ¶ 5).

During 2003 and 2004, Lafarge spent approximately $5 million to upgrade the Kiln Baghouse to help improve the Plant's overall performance and reduce costs.  (Stinson Aff. ¶ 10).  One of the economic justifications specifically cited for upgrading the Kiln Baghouse involved Lafarge's ability to reduce the headcount on the dust collection repair crew managed by Jeffers.  (Stinson Aff. ¶ 11).  This upgrade, in fact, resulted in a significant decrease in the maintenance labor hours needed to repair the Kiln Baghouse (Stinson Aff. ¶ 12), which, in turn, obviated the need for a Dust Collector Supervisor.  The defendant's evidence shows that Jeffers' position was eliminated because his job duties were no longer needed.

Second, as Jeffers admits, during 2004, he was managing a maintenance crew of one employee and cross training three other employees (Pl. Dep. 63) or managing two employees. (Pl. Dep. 96).  Morkem has testified that he was not aware of any other supervisor at a Lafarge facility that had a crew of only two people.  (Morkem Aff. ¶ 9).  Morkem testified that because Jeffers was not managing or directing a full maintenance crew, his position could be eliminated and the duties he was performing could be transferred to Quattlebaum and his crew could be transferred over to other individuals in the Maintenance Department.  (Morkem Aff. ¶ 14).  The elimination of Jeffers' position not only helped ease the economic problems associated with the Kiln Tyre crack, but it also was consistent with Lafarge's efforts to reduce maintenance costs by moving towards a maintenance team in which all individuals were cross trained to perform all the maintenance functions in the Plant.  (Hoffman Aff. ¶ 36).

Third, it is undisputed that after the Harleyville Kiln Tyre crack occurred on February 9, 2005, Lafarge's need to reduce costs and eliminate unnecessary positions became more urgent. Jeffers does not dispute that the Kiln Tyre crack resulted in a total additional cost to Lafarge in

2005 of at least $1,550,000.00.  In fact, Lafarge estimated that for each day that the Kiln was not operating, it cost the Harleyville Plant approximately $200,000 in lost productivity.  Jeffers admits that the Kiln Tyre crack shut down production at the Harleyville Plant and that it had a negative impact on the financial performance for the Site.  (Pl. Dep. 92, 95).  Lafarge argues that when its management representatives met in March 2005 to develop a plan for addressing the negative financial impact of the Kiln Tyre crack, the decision to eliminate Jeffers' position and have his responsibilities absorbed by other maintenance personnel was more than justified by the exigent financial circumstances.

Therefore, even if Jeffers had presented a prima facie case of age discrimination, Lafarge has produced sufficient non-discriminatory reasons for eliminating Jeffers' position, and thus could rebut Jeffers' prima facie case.  For the sake of discussion, the Court nonetheless will address the final step in the McDonnell Douglas analysis and consider whether Jeffers has set forth evidence that Lafarge's "proffered justifications" for its decision to eliminate his position were a pretext for age discrimination.  Warch, 435 F.3d at 514, *quoting* Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004)).

**Whether Jeffers can show pretext**

Even if Jeffers had established a prima facie case of discrimination, Jeffers cannot show that Lafarge's reasons for terminating him are pretextual.  Lafarge contends that Jeffers' termination was compelled by the need to reduce costs.  (Def.'s Mem. Summ. J. 20-22).  To begin with, Jeffers' own statements confirm that Lafarge had an economic reason for eliminating his position.  Jeffers admits that he was assigned most of the dust collection repair work in his position as Maintenance Supervisor.  (Pl. Dep. 41-43).  Jeffers admits that at the time he received

his December 2004 performance review, his maintenance crew only had one full time employee assigned to it. (Pl. Dep. 98; and Ex. 1). Jeffers admits that at the time his position was eliminated, he was in the process of cross-training three maintenance employees so that they all would be capable of performing dust collection work and other maintenance duties. (Pl. Dep. 99). Jeffers also admits that the Kiln Tyre crack had a negative impact on the financial performance of the Harleyville Plant. (Pl. Dep. 95). Finally, Jeffers admits that Lafarge has the right to manage the plant in the most profitable manner. (Pl. Dep. 120). Thus, Jeffers' admissions fail to rebut Lafarge's articulation of legitimate, non-discriminatory reasons for eliminating his position.

Furthermore, Jeffers cannot establish pretext by relying on the undisputed fact that all of the employees eliminated by the RIF, either because of poor work performance or because of job elimination, were in the protected class. In *Fobian v. Storage Tech. Corp.,* 959 F.Supp. 742 (E.D. Va. 1997), *aff'd* 217 F.3d 838 (4th Cir. 2000) (Table) (per curiam), the plaintiff claimed that the employer's adverse employment actions were pretextual because it was statistically improbable that the three oldest employees had been selected for termination. *Fobian,* 959 F.Supp. at 745. However, as the court noted, "there is not one single shred of evidence presented in support of this argument. To support this theory, plaintiff relies on the arguments of counsel exclusively. Even the most cogent arguments, if unaccompanied by actual evidence, will not save a claim at the summary judgment stage." *Fobian,* 959 F.Supp. at 745, *citing Fisher v. Asheville-Buncombe Technical College*, 857 F.Supp. 465, 470 (W.D.N.C. 1993) (concluding, under similar circumstances, that "the statistical evidence produced . . . is simply too speculative to be probative of anything except that Plaintiff's counsel is proficient in mathematics.") (*citing*

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 433 n.32, 95 S.Ct. 2362, 2379 n.32, 45 L.Ed.2d 280 (1975) (statistical evidence not probative where prepared by interested party and not validated by expert statistician)).

Here, it is undisputed that Jeffers, as well as the other employees who were discharged for poor work performance or who had their positions eliminated, were over the age of 40. Yet Jeffers cannot rely on this fact alone to establish pretext, as this fact is meaningless unless it is viewed in the proper context. Jeffers has not established the total number of employees working at the Harleyville Plant at the time his job was eliminated or their ages. Thus, to the extent that Jeffers argues that pretext is shown because all of the persons discharged were over the age of 40, this argument, without the proper contextual background, does not establish pretext. Based upon the material and undisputed facts before the Court, Jeffers cannot establish that Lafarge's reasons for eliminating his position are a pretext for age discrimination.

Lastly, Jeffers claims he can show pretext because Lafarge violated its policy entitled "Salaried Position Elimination" when it terminated him. (Pl. Ex. 18; Pl. Mem. Opp'n 26). Jeffers contends that the policy required Lafarge to "attempt to retain an employee when his/her position is eliminated due to changing business conditions or organization realignment." (Pl. Ex. 18). Jeffers argues that this policy required Lafarge first to have attempted to reassign Jeffers to a position at the Harleyville Plant, and if that were not possible, to a position with Lafarge outside of the Harleyville Plant. (Id.). Jeffers claims that there is no evidence that Lafarge followed this policy when it eliminated his position, or that Lafarge attempted to find another position for him. Jeffers contends that had Lafarge followed its own policy, he very well may have remained employed. (Pl. Mem. Opp'n 26). Jeffers claims that Lafarge's violation of its

policy is evidence that the defendant did not want to employ him "in any capacity because of its own discriminatory bias."  (Pl. Mem. Opp'n 27).

Jeffers, however, does not refer this Court to any documents or testimony to support his argument that Lafarge failed to even attempt to apply its policy to him.  In fact, as Harrison has testified, Lafarge did apply this policy to Jeffers at the time his position was eliminated in March 2005.  (Harrison Reply Aff. ¶¶ 10-12).  Jeffers' unsubstantiated claim does not establish pretext.

Based upon the material and undisputed facts before the Court, Jeffers has failed to establish the fourth prong of his prima facie case.  Even if Jeffers had done so, however, Lafarge has advanced a legitimate, non-discriminatory reason for his termination, and Jeffers has not establish that Lafarge's reasons for eliminating his position were pretextual.

**Conclusion**

Therefore, the Court grants Lafarge's motion for summary judgment.

**AND IT IS SO ORDERED.**


_____    ____
**C. WESTON HOUCK**
**UNITED STATES DISTRICT JUDGE**

September 23, 2008
Charleston, South Carolina